## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

**ESTATE OF TROY RAY BOYD, et al.**                    **PLAINTIFFS**

**v.**                                   **Civil No. 5:15-cv-107-HSO-JCG**

**PIKE COUNTY, MISSISSIPPI, et al.**                      **DEFENDANTS**

---

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT TERRY BEADLES' MOTION [42] FOR SUMMARY JUDGMENT PREMISED ON QUALIFIED IMMUNITY

BEFORE THE COURT is the Motion [42] for Summary Judgment Premised on Qualified Immunity filed by Defendant Terry Beadles. This Motion is fully briefed. After due consideration of the record, the submissions on file, and relevant legal authority, the Court finds that the Motion should be granted.

## I. RELEVANT BACKGROUND

A.    Factual Background

The undisputed facts in this case establish that on March 15, 2015, Deputy Terry Beadles of the Pike County Sheriff's Department ("Deputy Beadles") and the rest of his shift were searching for a shooting suspect in the outskirts of the City of McComb, Mississippi, Beadles Trial Tr. [42-4] at 139-40, when Deputy Beadles received a call from dispatch requesting medical assistance for a man who was seen slumped over a four-wheel all-terrain vehicle ("ATV"), bloodied with a possible head injury, and who may have been dead, *id.* at 140, 142. Deputy Beadles and Officer McDonald responded to the call.

Deputy Beadles testified that while he and Officer McDonald were en route, dispatch advised them that the reporting party, Anna Cutrer ("Ms. Cutrer"), had stated that the man had several edged weapons on his vehicle. *Id.* at 140. Ms. Cutrer later testified that the man, Troy Ray Boyd ("Mr. Boyd"), was not holding a weapon and that she saw only a machete on the ATV. Cutrer Trial Tr. [48-2] at 94. Ms. Cutrer testified that she never mentioned that fact to dispatch. *Id.* Ms. Cutrer did not know if Mr. Boyd was too impaired to drive or if the ATV itself was "kind of wobbly." *Id.* at 95.

Deputy Beadles and Officer McDonald traveled to the area "not knowing what the situation was" to try to contact the individual because they "didn't know what the ambulance crew was going to be running into." Beadles Trial Tr. [42-4] at 140. Dispatch later informed Deputy Beadles that the man was now at the intersection of McEwen Swamp Road and Highway 570 East. *Id.* at 141. Deputy Beadles first saw Mr. Boyd driving on McEwan Swamp Road, *id.* at 142, and "pulled up behind him" and "realized that he wasn't running from me, but he also was not stopping," *id.* Deputy Beadles "thought maybe [Mr. Boyd] just was not aware of his surroundings." *Id.*

Deputy Beadles parked his marked patrol vehicle in front of Mr. Boyd's ATV and exited his vehicle to attempt to speak with Mr. Boyd. *Id.* Mr. Boyd rode around Deputy Beadles' SUV and stopped in front of it. *Id.* Deputy Beadles asked Mr. Boyd to get off the four-wheeler and speak with him to assess the situation, but Mr. Boyd just stared at him. *Id.* at 142-43. At that time, Deputy Beadles did not

intend to arrest Mr. Boyd, nor did he suspect Mr. Boyd of committing a crime. *Id.* at 160. Deputy Beadles' intent was to determine why Mr. Boyd was injured. *Id.*

As Deputy Beadles was attempting to speak with Mr. Boyd, Mr. Boyd accelerated his ATV. *Id.* at 143. Deputy Beadles "reached out to grab [Mr. Boyd's] wrist and stay ahold of him to say – to tell him, 'Hey, I need you to talk to me and tell me what's going on.'" *Id.* Before Deputy Beadles could do so, Mr. Boyd grabbed Deputy Beadles' left sleeve, tucked the officer's arm under his arm, and fully accelerated the ATV. *Id.* at 143-44. To avoid being dragged on the asphalt, Deputy Beadles grabbed the back of Mr. Boyd's sweatshirt and rested his abdomen on the ATV. *Id.* at 144. Deputy Beadles saw a machete strapped to the four-wheeler's back rack. *Id.* After being dragged for about fifty feet, Deputy Beadles freed himself from Mr. Boyd's grasp, pushed off the back bar of the ATV, and landed on the road. *Id.* at 144-45. Officer McDonald pursued Mr. Boyd as Deputy Beadles returned to his patrol vehicle. McDonald Trial Tr. [42-5] at 103.

Deputy Beadles radioed to Officer McDonald that he "didn't care how far [Deputy Beadles] had to chase [Mr. Boyd], [the officers] were going to charge him with assault on a police officer." Beadles Trial Tr. [42-4] at 162. Deputy Beadles testified that his "training kicked in," and his job at that point "was to stop somebody who committed a violent crime." *Id.*

The officers pursued Mr. Boyd for two to two-and-a-half minutes. McDonald Trial Tr. [42-5] at 103; Beadles Trial Tr. [42-4] at 146-47. Deputy Beadles testified that he chased Mr. Boyd at speeds between forty-five and fifty miles an hour and

that Mr. Boyd "t[ook] corners at such a high rate of speed on the four-wheeler that he was actually getting it up on two wheels at points." Beadles Trial Tr. [42-4] at 146-47. Robbie Travis ("Mr. Travis"), an eyewitness to the shooting who owns a similar ATV and has driven the same ATV model as Mr. Boyd's, later stated his opinion that Mr. Boyd's ATV could go only as fast as twenty-five or thirty miles per hour. Travis Trial Tr. [48-6] at 13-15.

Eventually, Deputy Beadles passed Mr. Boyd and unsuccessfully attempted to conduct a rolling stop of the ATV. McDonald Trial Tr. [42-5] at 106; Beadles Trial Tr. [42-4] at 148. Deputy Beadles then drove further ahead and parked his vehicle at an angle across the road, leaving "[a]n avenue of escape for anybody who needed to get by." Beadles Trial Tr. [42-4] at 148-49. At this point, the parties' versions of events diverge.

1. Deputy Beadles' Version

Deputy Beadles exited his vehicle and stood at the front left side of his SUV to observe Mr. Boyd's approach. *Id.* at 149-50. Mr. Boyd approached slowly at first, but then rapidly accelerated when he was twenty-five yards from Deputy Beadles. *Id.* at 150. Deputy Beadles drew his gun and "continu[ed] to yell for him to stop" when he "realized [Mr. Boyd] was not going to slow down." *Id.* at 150-51. Upon Deputy Beadles drawing his firearm, Mr. Boyd "turned the four-wheeler slightly towards [Deputy Beadles] and began to come directly at [him]." *Id.* at 151. "At that point when [Deputy Beadles] felt that [he] had no other option, that [his] life was in jeopardy, [Deputy Beadles] began to take defensive actions and defend [his] own life

by firing at the suspect." *Id.* Deputy Beadles fired six rounds, with approximately a "second-and-a-half" elapsing between the first and last shot. *Id.* at 152. Deputy Beadles testified that he ceased firing when he realized he was no longer in jeopardy and Mr. Boyd was no longer threatening him. *Id.* at 153.

Deputy Beadles got back into his vehicle and pursued Mr. Boyd. *Id.* Officer McDonald later found Mr. Boyd face down in a ditch a short distance away. McDonald Trial Tr. [42-5] at 127. Officer McDonald informed Deputy Beadles that Mr. Boyd was breathing but unresponsive. Beadles Trial Tr. [42-4] at 153. Deputy Beadles radioed dispatch for an ambulance, *id.* at 154, then he and Officer McDonald began performing life-saving measures on Mr. Boyd until an emergency medical technician arrived, *id.* at 155. Unfortunately, Mr. Boyd passed away. *Id.* at 156. An autopsy report found bullet "entrance wounds to the right side of the back and left lower leg." Autopsy [42-8] at 2.

2.    Plaintiffs' Version

Mr. Travis lives on Archie Boyd Road in Pike County, Mississippi, Travis Trial Tr. [48-6] at 12, and was at home on March 15, 2015, *id.* at 13. Mr. Travis heard sirens "coming through the swamp," so he "stepped out on the porch" and saw "two officers following a four-wheeler." *Id.* Deputy Beadles sped up, passed Mr. Boyd, and parked his vehicle before stepping out of it. *Id.* According to Mr. Travis, Deputy Beadles was beside his car on the right side of the road, at "[a]bout the middle" of his car. *Id.* at 17, 21. Mr. Boyd was in the far left lane, on the far inside

of the curve in the road, and Mr. Travis testified that if a car would have been coming in the other direction, it would have run over Mr. Boyd. *Id.* at 17.

Deputy Beadles "hollered" at Mr. Boyd to "[s]top, stop, stop," *id.* at 16, but Mr. Boyd kept driving on the inside of the curve, *id.* at 16-17. Mr. Travis saw Deputy Beadles draw his weapon "[r]ight before Troy was up even with him." *Id.* at 17. Mr. Travis testified that the officer never appeared to be in any danger and he did not see Mr. Boyd make any moves towards the officer. *Id.* at 18.

B.    Procedural History

Plaintiffs Estate of Troy Ray Boyd and minors Z.B. and G.B., by and through their mother Amy Boyd ("Plaintiffs"), are Mr. Boyd's wrongful death beneficiaries. Am. Compl. [6] at 1-2. On February 8, 2016, Plaintiffs filed a Complaint in this Court against Deputy Beadles and Officer McDonald in their individual capacities and against Pike County, Mississippi, advancing claims under 42 U.S.C. § 1983. *Id.* Plaintiffs claim that the individual defendants: (1) "violat[ed] Troy's Fourth Amendment right to be free from unreasonable seizures by chasing him without cause, then using unreasonable, deadly force by shooting Troy four times in the back, thereby causing his death;" and (2) "failed to provide Boyd with adequate medical care as requested by the 911 caller" in violation of Mr. Boyd's Eighth and Fourteenth Amendment rights.[1]  *Id.* at 5-6.

---

[1]      Plaintiffs have acknowledged that there are no state-law claims set forth in their Complaint and that they are only asserting federal constitutional claims.  Order [32].

On April 13, 2016, Officer McDonald filed a Motion [25] to Dismiss Based on Qualified Immunity, which the Court construed as a Motion for Judgment on the Pleadings.  Order [33] at 3.  The Court found that Officer McDonald was entitled to qualified immunity and dismissed Plaintiffs' claims against him on June 24, 2016.  *Id.* at 1.  Specifically, the Court found that Plaintiffs' Amended Complaint did not sufficiently allege that Officer McDonald seized or used any force at all against Mr. Boyd.  *Id.* at 6, 7.  Regarding Plaintiffs' Eighth and Fourteenth Amendment claims, the Court concluded that Officer McDonald was never constitutionally required to provide Mr. Boyd with medical care and that Plaintiffs failed to allege facts that showed Officer McDonald responded in an objectively unreasonable manner.  *Id.* at 9.

On July 11, 2016, Deputy Beadles filed a Motion [35] to Stay Case Pending Criminal Prosecution, on grounds that a grand jury of Pike County, Mississippi, had returned an indictment on September 9, 2015, against Deputy Beadles on the charge of manslaughter related to the same set of facts as in this civil litigation.  Mot. [35] at 1; Indictment [35-2].  The Court entered an Order [39] staying the case, including a stay of all discovery, pending final resolution of the parallel criminal proceedings.  Order [39] at 1.  A jury trial was held in the criminal case on September 27 and 28, 2016, in the Circuit Court of Pike County, Mississippi.[2]  Mot.

---

[2]     It is from that criminal trial that the parties submitted, in support of their respective positions regarding the present Motion [42], the trial transcripts of several witnesses' testimony, including that of Deputy Beadles, Officer McDonald, Ms. Cutrer, and Mr. Travis.

[40] at 1-2. The jury returned a verdict of not guilty, Def.'s Mem. [43] at 2, and on April 5, 2017, the Court lifted the stay of proceedings.

On June 2, 2017, Deputy Beadles filed his Motion [42] for Summary Judgment Premised on Qualified Immunity. Deputy Beadles contends that his first encounter with Mr. Boyd should not be considered a stop, but even if so construed, there existed reasonable suspicion to pull Mr. Boyd over for illegally operating his vehicle, and that Deputy Beadles was justified in pursuing Mr. Boyd after he assaulted the officer. Def.'s Mem. [43] at 10. Deputy Beadles argues that his use of deadly force was objectively reasonable because Mr. Boyd posed a threat of serious harm to Deputy Beadles and others, and that no controlling precedent has clearly established that Deputy Beadles' actions were unconstitutional. *Id.* at 11-12, 14. Deputy Beadles asserts that this Court's analysis in its prior Order [33] is equally applicable to Deputy Beadles with regard to Plaintiffs' Eighth and Fourteenth Amendment claims.[3] *Id.* at 16.

Plaintiffs counter that Deputy Beadles violated Mr. Boyd's right to be free from unreasonable seizures because he has acknowledged that the 911 call requested medical assistance, Mr. Boyd was not suspected of any crime during the initial stop, and officers usually do not ticket for driving a four-wheeler on the road. Pls.' Mem. [49] at 8. Plaintiffs argue that Deputy Beadles' use of force violated Mr.

---

[3]     On March 5, 2018, Deputy Beadles filed a Motion [53] for Leave to File Supplemental Authorities in Support of Motion for Summary Judgment. In a text order entered on March 6, 2018, the Court granted the Motion [53] and directed Plaintiffs to file any response by March 13, 2018. To date, Plaintiffs have not filed a response.

Boyd's constitutional rights because Deputy Beadles created the danger to Mr. Boyd by blocking the road, Deputy Beadles should have known that Mr. Boyd would be traveling in his direction when he passed Mr. Boyd, Deputy Beadles did not fire his weapon until Mr. Boyd was beside him, and Mr. Boyd could not travel at high speeds on an old four-wheeler. *Id.* at 8-9, 13-14.

Deputy Beadles notes in his Reply that Plaintiffs failed in their Response to argue in support of their Eighth Amendment claim and made only a conclusory allegation that Deputy Beadles violated Mr. Boyd's Fourteenth Amendment rights. Reply [50] at 1-2. Deputy Beadles further posits that Mr. Travis' testimony does not raise a triable issue of fact as to excessive force. *Id.* at 6.

## II. <u>DISCUSSION</u>

### A.   <u>Relevant Legal Standard</u>

#### 1.   <u>Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir.

2000).  "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted).  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).

2.     Qualified Immunity

"The doctrine of qualified immunity protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citation omitted).  "To determine whether a public official is entitled to qualified immunity, we decide (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Id.* (citation and quotation marks omitted).  A court may conduct the two-pronged qualified immunity inquiry in any sequence. *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

"A qualified immunity defense alters the usual summary judgment burden of proof.  Once an official pleads the defense, the burden then shifts to the plaintiff,

who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citation omitted).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and quotation marks omitted). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

B.    Analysis

1.    Deputy Beadles' Initial Encounter with Mr. Boyd

Deputy Beadles contends that his initial encounter was not a stop, but that even if it was he had reasonable suspicion that Boyd was operating his vehicle in violation of Mississippi law. Def.'s Mem. [43] at 10. Plaintiffs counter that Deputy Beadles unreasonably seized Mr. Boyd during the initial stop because the 911 call was only for medical assistance, Mr. Boyd was not suspected of any crime at that

time, and officers usually do not ticket for driving four-wheelers on roadways. Pls.'
Mem. [49] at 8.[4]

The Fourth Amendment guarantees individuals the right to be "secure in
their persons, houses, papers, and effects, against unreasonable searches and
seizures." U.S. Const. amend. IV. "[A] law enforcement officer's reasonable
suspicion that a person may be involved in criminal activity permits the officer to
stop the person for a brief time and take additional steps to investigate further."
*Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004). "The Fourth
Amendment requires only some minimum level of objective justification for the
officers' actions – but more than a hunch – measured in light of the totality of the
circumstances." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994).
"Reasonable suspicion must be supported by particular and articulable facts, which,
taken together with rational inferences from those facts, reasonably warrant an
intrusion." *Id.*

Section 63-7-7 of the Mississippi Code states: "It is a misdemeanor for any
person to drive . . . on any highway any vehicle . . . which is in such unsafe
condition as to endanger any person[.]" Section 63-31-3 of the Mississippi Code
permits operation of off-road vehicles upon public property if certain conditions are

---

[4]     Plaintiffs' Amended Complaint initially claimed that Deputy Beadles is "liable to the
Plaintiffs for violating Troy's Fourth Amendment right to be free from unreasonable seizures by
chasing him without cause[.]" Am. Compl. [6] at 5. However, Plaintiffs' Response only mentions
once, in conclusory fashion, that Deputy Beadles was "unreasonable in stopping [Mr. Boyd], chasing
him, . . . ." Pls.' Mem. [49] at 1. Plaintiffs' Response makes it clear that their claim is that "Beadles'
initial stop of Troy Boyd was unreasonable," but nowhere in their Response do Plaintiffs explain how
it was unreasonable for Deputy Beadles to pursue Boyd after Boyd fled from the initial encounter.

met, but subsection (6) provides: "Nothing in this section shall be construed to authorize operation of an off-road vehicle on a public road or highway of this state." The Mississippi Attorney General has opined that "an operator of an ATV on the public roadway may be charged with operating a motor vehicle upon a public road without the proper safety equipment, (see Mississippi Code Sections 63-7-1 et. seq.), or without an inspection[5] sticker." *Re: Three and Four Wheelers*, 2003 WL 22348870, at *2 (Miss. A.G. Sept. 12, 2003). The undisputed facts reveal that Deputy Beadles first observed Mr. Boyd on his ATV on McEwan Swamp Road, a public road. Deputy Beadles therefore had reasonable suspicion to believe Mr. Boyd had violated Mississippi law and it was reasonable to stop Mr. Boyd for a brief time and take additional steps to investigate further.

Plaintiffs note that Deputy Beadles testified that he only stopped Mr. Boyd to find out why Mr. Boyd was injured and that he did not suspect Mr. Boyd of any crime. Pls.' Mem. [49] at 8. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively,* justify the action. The officer's subjective motivation is irrelevant." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (citations and quotations marks omitted). Deputy Beadles is entitled to qualified immunity on Plaintiff's unreasonable seizure claim arising out of the initial stop.

---

[5] At the time of this encounter, Mississippi law required "that every motor vehicle . . . registered in this state be inspected and that an official certificate of inspection and approval be obtained for each such vehicle. Each such vehicle must display at all times a certificate of inspection and approval duly issued for such vehicle[.]" Miss. Code Ann. § 63-13-7, *repealed* by Laws of 2015, Ch. 417, § 1, effective July 1, 2015.

2.     Plaintiffs' Eighth and Fourteenth Amendment Claims

Deputy Beadles contends that Plaintiffs' Eighth and Fourteenth Amendment claims should be dismissed.  Def.'s Mem. [43] at 15-16.  In their Response, Plaintiffs do not address their Eighth Amendment claim and merely allege that Deputy Beadles violated Mr. Boyd's "rights under the, Fourth and Fourteenth Amendments, while acting under the color of law."  Pls.' Mem. [49] at 1.  "[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." *Eason v. Thaler*, 73 F .3d 1322, 1325 (5th Cir. 1996) (per curiam).  Because Plaintiffs do not adequately contest Deputy Beadles' motion for summary judgment on their Eighth and Fourteenth Amendment claims, those claims are deemed abandoned, and summary judgment is appropriate.  *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned retaliation claim when she failed to defend claim in response to motion to dismiss); *Vela v. City of Houston,* 276 F.3d 659, 678–79 (5th Cir. 2001) (limitations defense not raised in response to motion for summary judgment or supplemental answer was abandoned).

Regardless, any argument by Plaintiffs on this issue would be unpersuasive. "The Eighth Amendment's proscription of cruel and unusual punishments is violated by deliberate indifference to serious medical needs of prisoners."  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983) (citation and quotation marks omitted).  The Eighth Amendment protects only those formally convicted of a

crime and does not protect pretrial detainees. *Id.* It is undisputed that Mr. Boyd was not a convicted prisoner, and the Eighth Amendment never applied to him.

The Due Process Clause of the Fourteenth Amendment "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *Id.* "The plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015) (citation omitted). "Deliberate indifference is an extremely high standard to meet." *Id.* (citation and quotation marks omitted). "A plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (citation and quotation marks omitted).

The undisputed facts show that Deputy Beadles tried to speak with Mr. Boyd to assess the situation regarding his injuries in order to prepare the area for emergency personnel. Instead, Mr. Boyd assaulted Deputy Beadles and fled. After Mr. Boyd was shot, Deputy Beadles radioed for an ambulance and attempted life-saving measures. Plaintiffs have not created a genuine dispute of fact that Deputy Beadles violated Mr. Boyd's Fourteenth Amendment rights. Accordingly, Deputy Beadles is entitled to summary judgment on this claim.

3.      Plaintiffs' Excessive Force Claim

    a.      Whether a Genuine Dispute of Material Fact Exists that Deputy
            Beadles Violated Mr. Boyd's Constitutional Rights

"The use of deadly force for apprehension is a seizure subject to the

reasonableness requirement of the Fourth Amendment." *Hathaway v. Bazany*, 507

F.3d 312, 320 (5th Cir. 2007).  "To prevail on an excessive force claim, a plaintiff

must show (1) an injury, (2) which resulted directly and only from the use of force

that was clearly excessive, and (3) the excessiveness of which was clearly

unreasonable." *Manis*, 585 F.3d at 843 (citation and quotation marks omitted).  "An

officer's use of deadly force is not excessive, and thus no constitutional violation

occurs, when the officer reasonably believes that the suspect poses a threat of

serious harm to the officer or to others." *Id.*  Specifically,

> [w]here the officer has probable cause to believe that the suspect poses
> a threat of serious physical harm, either to the officer or to others, it is
> not constitutionally unreasonable to prevent escape by using deadly
> force. Thus, if the suspect threatens the officer with a weapon or there
> is probable cause to believe that he committed a crime involving the
> infliction or threatened infliction of serious physical harm, deadly force
> may be used if necessary to prevent escape, and if, where feasible, some
> warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

"The question is one of 'objective reasonableness,' not subjective intent, and

an officer's conduct must be judged in light of the circumstances confronting him,

without the benefit of hindsight." *Manis*, 585 F.3d at 843.  Moreover, "[t]he calculus

of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments – in circumstances that are tense, uncertain,

and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

As Plaintiffs are the nonmoving party, the Court must view the facts and inferences in the light most favorable to them. Therefore, the Court will accept as true, for purposes of this Motion, Mr. Travis' testimony that Deputy Beadles was beside his car on the right side of the road, that Mr. Boyd was on the left side of the road, that Deputy Beadles drew his gun right before Mr. Boyd was even with Deputy Beadles, and that Mr. Boyd did not make any moves towards Deputy Beadles.

Plaintiffs allege in their Response that Deputy Beadles shot Mr. Boyd four times in the back. Pls.' Resp. [48] at 2. However, Plaintiffs do not cite any record evidence to support this allegation, which is their burden at summary judgment. *See Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("conclusory allegations" or "unsubstantiated assertions" do not create a fact issue on summary judgment) (citation omitted). Plaintiffs made this same allegation in their Complaint, but at this stage, Plaintiffs must move beyond the pleadings and designate specific facts demonstrating a genuine dispute of material fact. *Little*, 37 F.3d at 1075.

In their Memorandum Brief, Plaintiffs contend that Deputy Beadles' "use of excessive force was totally unreasonable and unlawful" given the fact that Deputy "Beadles did not shoot until Troy was beside him." Pls.' Mem. [49] at 9. This comports with Plaintiffs' recitation of Mr. Travis' testimony that "as soon as Troy got about even with Beadles' SUV, Beadles started shooting[.]" *Id.* at 6 (citing

Travis Trial Tr. [48-6] at 17). Deputy Beadles argues that of the six shots he fired, only one was fired when Mr. Boyd drove "immediately past the patrol car." Def.'s Mem. [43] at 13. However, Deputy Beadles' Memorandum Brief cites the autopsy report which states that Mr. Boyd sustained "entrance wounds to the right side of the back and left lower leg." *Id.* at 5-6; Autopsy [42-8] at 2. It is not clear whether the autopsy report's use of "wounds" means Mr. Boyd suffered one shot to the back and a second to the left leg, or he sustained multiple wounds to the back and multiple wounds to the leg. Viewing the inferences in the light most favorable to Plaintiffs, the nonmoving party, the Court will assume for purposes of this Motion that Mr. Boyd sustained multiple gunshot wounds to the back.

Based upon these facts, the Court concludes that Plaintiffs have not carried their burden of showing that Deputy Beadles acted unreasonably. Deputy Beadles had probable cause to believe that Mr. Boyd posed a threat of serious physical harm to himself and to others. The undisputed facts show that Mr. Boyd, just minutes prior to the shooting, grabbed Deputy Beadles' arm and fully accelerated the ATV, dragging Deputy Beadles and reasonably placing him in fear for his safety. Mr. Boyd had refused to stop despite multiple, escalating efforts to have him do so and he was operating an ATV on a public road. There was no reason to think that Mr. Boyd, having already assaulted a law enforcement officer, was not also a threat to others.

It is further undisputed that Mr. Boyd had a machete on the ATV and that Deputy Beadles was aware of that fact. Even accepting Mr. Travis' testimony as

true that Deputy Beadles stood on the right side of the road and that Mr. Boyd drove on the left side, it was not objectively unreasonable for Deputy Beadles to believe that Mr. Boyd presented an ongoing threat of serious harm to Deputy Beadles or others. Plaintiffs point the Court to pictures of the road where the shooting occurred, Pls.' Mem. [49] at 5-6, but a review of the photographs reflects that the road appears to be somewhat narrow and lacks any centerline stripe, Photographs [48-7]. Given that Mr. Boyd had already assaulted Deputy Beadles, did not yield to a rolling stop, and did not heed Deputy Beadles' later commands to stop, Deputy Beadles was forced to make a split-second judgment in tense and uncertain circumstances as Mr. Boyd drove in Deputy Beadles' general direction. There has been no dispute created that the shots were fired in a very brief time span, according to Deputy Beadles, within one-and-a-half seconds. Plaintiffs have not shown a genuine dispute that Deputy Beadles' use of force was clearly excessive to the need or clearly unreasonable.

b.     Whether Deputy Beadles Violated Clearly Established Law

In the alternative, summary judgment should be granted to Deputy Beadles on Plaintiffs' excessive force claim because Plaintiffs have also failed to carry their burden on the second prong of the qualified immunity analysis. To defeat summary judgment here, Plaintiffs must show that Deputy Beadles' conduct violated clearly established law by pointing the Court to "any cases of controlling authority" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617

(1999); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2016 (2014). Plaintiffs have not done so. In fact, Plaintiffs' Memorandum [49] is sparsely briefed and contains little analysis of the facts applying them to any relevant caselaw. What Plaintiffs have presented is three categories of arguments, which are not persuasive either individually or collectively.

First, Plaintiffs merely identify the broad rule for excessive force cases set forth in *Graham* and *Saucier* that "the use of force is contrary to the Fourth Amendment, if it is excessive under objective standards of reasonableness." Pls.' Mem. [49] at 10 (citing *Saucier*, 533 U.S. at 202). The difficulty facing Plaintiffs here is that the broad tests set out in "*Graham* and *Garner* . . . are cast at a high level of generality." *Brosseau*, 543 U.S. at 199. The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742) (internal quotation marks and ellipses omitted). "The dispositive question [of] whether the violative nature of *particular* conduct is clearly established . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context," because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (citation omitted).

True, "in an obvious case, these standards [in *Graham* and *Garner*] can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*,

543 U.S. at 199. Such general tests are not sufficient in this case, however, given the apparently undisputed fact that Mr. Boyd had previously assaulted Deputy Beadles on his ATV, had a machete on his vehicle, refused to yield to a rolling stop or to Deputy Beadles' demands to stop, and continued to drive in Deputy Beadles' general direction. "The present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Id.* Plaintiffs have not pointed the Court to specific facts that would make this case an obvious one. The "correct inquiry," therefore, is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation [Deputy Beadles] confronted." *Mullenix*, 136 S. Ct. at 309. With respect to the specific inquiry at issue here, Plaintiffs have failed to "identif[y] a single precedent – much less a controlling case or robust consensus of cases – finding a Fourth Amendment violation 'under similar circumstances.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

Second, Plaintiffs attempt to distinguish cases on which Deputy Beadles relies and cite *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992), and *Mullenix*, 136 S. Ct. at 309, all of which are cases where courts held that the officers were entitled to qualified immunity. "But the mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here." *Mullenix*, 136 S. Ct. at 312. In other words, it is not sufficient for Plaintiffs to carry their burden to simply

argue that this case is distinguishable from other cases where courts have granted law enforcement officers qualified immunity.

Third, Plaintiffs rely on *Gutierrez v. City of San Antonio*, 139 F.3d 441, 442 (5th Cir. 1998), but that case is of limited value here because factual disputes prevented the *Gutierrez* court from determining the reasonableness of the officers' conduct. In that case, two police officers hog-tied Gutierrez after he kicked the driver's seat, metal cage, and windows of the patrol car as the officers transported him to the hospital. *Id.* at 443. The threat, if any, posed to the officers or others was thus considerably less than the facts of this case show. The facts of *Gutierrez* are quite dissimilar from those here and the case offers little guidance on whether Deputy Beadles violated clearly established law. Plaintiffs cite no other cases to support their position that Deputy Beadles violated clearly established law.

Even if Plaintiffs had identified a clearly established right in this specific context and provided the Court with a pertinent controlling case or robust group of persuasive cases, there is insufficient evidence to support a conclusion that Deputy Beadles was plainly incompetent or knowingly violated the law. In *Thompson v. Mercer*, 762 F.3d 433, 436 (5th Cir. 2014), Keith Thompson stole a vehicle, kidnapped its sleeping occupant, and then fled for two hours at speeds of over 100 miles per hour. Dispatchers heard Keith state that he would kill himself when he reached his destination. *Id.* Dispatchers also learned there was a firearm in vehicle. *Id.*

Sheriff Mercer laid in wait with an assault rifle on the shoulder of a rural road. *Id.* When Keith's vehicle came into view, Mercer fired into the hood, striking the radiator. *Id.* Keith did not appear to slow down. *Id.* Mercer then aimed directly into the windshield and fired twelve rounds. *Id.* Keith was struck three times in the head and neck and died. *Id.* 435, 436. Mercer conceded that "there were no bystanders in the area, and that he had seen no traffic in the vicinity." *Id.* at 436. The district court granted qualified immunity to Mercer. *Id.* at 435.

The Fifth Circuit concluded it was "clear that Mercer's use of deadly force was justified" based on the "grave risk" Keith presented. *Id.* at 438. The Thompsons argued that their son was no longer a risk because he was driving on a lonely road. *Id.* at 439. The Court of Appeals noted that the Supreme Court had "rejected the defense that 'the roads were mostly empty.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). The Fifth Circuit stated that it similarly "recognizes the 'inherent danger' of vehicular flight, 'even when no bystanders or other motorists are immediately present.'" *Id.* (quoting *Pasco ex rel. Pasco v. Knoblauch,* 566 F.3d 572, 580 (5th Cir. 2009)). Moreover, "governing standards allow law enforcement and the courts to take into account passersby that 'might have been present.'" *Id.* (quoting *Scott*, 550 U.S. at 384).

The Thompsons further argued that Mercer's decision was unreasonable at the time because Keith's truck did not pose a threat after Mercer struck the radiator with three bullets. *Id.* at 439. The Court of Appeals found otherwise:

> [T]he Thompsons' argument counterfactually presumes that Keith was only a threat to the extent that the truck was operational. Yet the truck was not the only deadly weapon at Keith's disposal. On the contrary, it is undisputed that he was in possession of a stolen firearm and that Mercer was aware of that fact. No one knows whether Keith had any intention of using the gun, but assume for the purposes of summary judgment that he did not. Even so, Mercer had no way of ascertaining Keith's intent, and there was no visible sign of surrender. Given that this unidentified suspect was admittedly suicidal and had already acted with utter desperation in attempting to evade law enforcement, Mercer was justified in assuming that there was an ongoing threat of serious harm to the officer or others, even if Keith's vehicle was already disabled.

*Id.* (citation and quotation marks omitted). The Fifth Circuit concluded that Mercer's use of deadly force did not violate the Fourth Amendment. *Id.* at 440.

In *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), a deputy responded to a report that a known car thief had violently threatened his ex-girlfriend. *Id.* at 407. The deputy learned that the suspect was driving a stolen Ford Taurus and was on bond for theft and unlawfully carrying a weapon. *Id.* When the deputy later spotted a Taurus at a known drug location, *id.*, he followed it and activated his sirens after the Taurus changed lanes without signaling, *id.* The Taurus did not stop but accelerated. *Id.* After a brief chase, the Taurus took a right turn too widely and collided with a vehicle in the oncoming lane. *Id.* After the deputy pulled his car twelve to fifteen feet behind the Taurus, it backed up toward the deputy's police cruiser and then began to drive away, making it three or four houses down the block. *Id.* at 407, 409. There were no bystanders in the vehicle's path. *Id.* at 409. The deputy fired twice at the Taurus, *id.*, and one shot struck and killed Heather Lytle, who was sitting in the back of the car, *id.* at 408. The district court

concluded that a genuine issue of material fact precluded summary judgment on qualified immunity. *Id.* The deputy filed an interlocutory appeal of that ruling. *Id.*

The Fifth Circuit affirmed, *id.* at 418, finding that the deputy's conduct weighed against a conclusion of reasonableness because firing at the rear of a fleeing vehicle some distance away was not clearly a reasonable method of addressing the threat, the deputy was not aiming to shoot the driver, and firing in a residential area risked striking an unintended target, *id.* at 412-13. Furthermore, "by the time the Taurus was three or four houses away, a jury could conclude that any immediate threat to O'Donnell had ceased." *Id.* at 413. The Court of Appeals inferred "that sufficient time might have passed for O'Donnell to perceive that the threat to him had ceased." *Id.* at 414. The Fifth Circuit further stated that a jury could conclude "that the Taurus did not pose a sufficient threat of harm" because "there were no children or bystanders in the path of the vehicle" and due to the short time the deputy pursued the Taurus. *Id.* at 416.

Also relevant here is *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005).[6] As Waterman drove over the speed limit through the Baltimore airport, an officer activated his sirens and pursued. *Id.* at 473. Waterman did not stop, and another officer joined in the chase. *Id.* The officers in pursuit communicated by radio with officers at a toll plaza at an upcoming tunnel. *Id.* at 474. One of the pursuing

---

[6]     Though *Waterman* is not a Fifth Circuit case, the Fifth Circuit quoted its holding in *Lytle*, 560 F.3d at 413, and discussed it at length in *Hathaway*, 507 F.3d at 321. Though *Waterman* itself is not controlling authority, to the extent the reasoning espoused by the *Waterman* court has been cited with approval by the Fifth Circuit in two cases, these cases together represent "a consensus of cases of persuasive authority."

officers radioed to the appellants – Officers Batton, Keel, and Heisey – that Waterman tried to run the officer off the road. *Id.*

Waterman drove through the tunnel and toward the toll plaza. *Id.* Waterman drove at a "normal speed" and five officers, including the three appellants, emerged. *Id.* With guns drawn, the officers approached Waterman's vehicle from the front and passenger side and yelled at him to stop. *Id.* Waterman coasted for one second at eleven miles per hour, then accelerated in the general direction of the toll plaza and the officers ahead of him. *Id.* At the instant of acceleration, Officer Keel was seventy-two feet ahead of the vehicle; Officer Heisey, thirty-eight feet ahead; and Officer Batton, sixteen feet ahead. *Id.* None of the officers stood directly in front of Waterman's vehicle, but stood a few feet to the passenger side of the car's projected path. *Id.* at 474-75. The Court of Appeals described the events as follows:

> Perceiving the lurching of the vehicle and Waterman's acceleration as the beginning of an attempt to run them over, [a]ppellants began firing their weapons as soon as Waterman accelerated. As the officers shot at him, Waterman's vehicle reached a top speed of approximately 15 miles per hour. Waterman's vehicle then passed all of the officers, avoiding them by several feet and temporarily stopping behind another vehicle blocking its path. As [a]ppellants scrambled toward Waterman, they continued to fire their weapons at him from the passenger side of the vehicle and from behind, ceasing their fire as he passed through the toll plaza.

*Id.* at 475.

The appellants fired a combined eight shots within a six-second period. *Id.* Waterman sustained five gunshot wounds and died. *Id.* Waterman's estate

brought a § 1983 claim against the appellants, *id.*, and the district court denied appellants' motion for summary judgment based on qualified immunity, *id.* The officers immediately appealed. *Id.*

The Fourth Circuit noted facts in the record that weighed both in favor of and against the conclusion that Waterman was trying to run over the officers. *Id.* at 477-78. However, "the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors." *Id.* at 478. The Fourth Circuit found that "if the officers paused for even an instant, they risked losing their last chance to defend themselves" because "the vehicle could have reached Officers Batton and Heisey in about one second." *Id.*

The court concluded that appellants "had probable cause to believe that Waterman's oncoming vehicle posed an immediate threat of serious physical harm at least to Officers Batton and Heisey," *id.* (footnote omitted), and observed that the district court had "relied heavily on the fact that none of the officers were *directly* in the path of Waterman's vehicle" when the officers fired, *id.* at 479. The Fourth Circuit determined, however, that "the closeness of the officers to the projected path of Waterman's vehicle is crucial to our conclusion that deadly force was justified." *Id.* First, "Waterman was accelerating in [a]ppellants' general direction and . . . Officers Batton and Heisey could have been run over in about one second if Waterman had turned slightly toward them." *Id.* Second, because Waterman "had used his vehicle as a weapon against another officer just minutes before," "[a]ppellants had reason to believe that Waterman's aggressiveness toward officers

trying to capture him suggested he was about to turn toward officers not yet in his path." *Id.* at 480. The foregoing led to a conclusion that the officers were entitled to qualified immunity with respect to "the initial group of shots." *Id.*

Waterman's estate pointed to witnesses' statements that "Waterman's vehicle did not appear to be a threat to the officers ahead." *Id.* at 479 n.8. The court found that such "opinions do not create a genuine issue of fact because the witnesses were unaware of the fact most critical to the probable cause analysis: that Waterman had reportedly attempted to use his vehicle as a weapon in order to avoid being captured only minutes before entering the toll plaza." *Id.* (citing *Pace v. Capobianco,* 283 F.3d 1275, 1280 & n.11 (11th Cir. 2002) (holding that lay witness opinion that approaching vehicle "did not appear to be a threat to any officer on the scene" did not preclude summary judgment because witness was not aware of events preceding the shooting that gave officers reason to believe that suspect would attempt to assault them)). The Fourth Circuit then engaged in a "separate analysis" for the shots fired after Waterman's vehicle passed the officers, *id.* at 480, and concluded that "the threat to their safety was eliminated and this could not justify the subsequent shots," *id.* at 482.

Turning to the particular facts of this case, Plaintiffs have not shown that Deputy Beadles violated clearly established law in this context, or that every reasonable officer in Deputy Beadles' situation would have understood that he was violating clearly established law. First, there appears to be some tension in this Circuit regarding the reasonableness of using deadly force to protect others from a

violent suspect fleeing in a vehicle, even though others may not be immediately present. Deputy Beadles asserts that Mr. Boyd posed a threat of serious harm to others, Def.'s Mem. [43] at 12, 14, though there appears to be no evidence that Deputy Beadles knew of any bystanders or motorists who were actually near Mr. Boyd at that moment. *Lytle* found that a jury could conclude that deadly force was unreasonable because there were no bystanders present. 560 F.3d at 416. However, as stated more recently in *Thompson*, the Fifth Circuit recognizes the "inherent danger" of vehicular flight, even when others are not present. 762 F.3d at 439. *Thompson* also posited that law enforcement may account for passersby who might be present. *Id.* Mr. Travis testified that Mr. Boyd would have collided with any oncoming vehicles from the opposite direction, and as such it was objectively reasonable for Deputy Beadles to believe that Mr. Boyd posed a serious risk for anyone who might be present.

Second, the case law does not clearly dictate the conclusion that Deputy Beadles was unjustified in perceiving danger to himself or others and responding as he did even if, as Mr. Travis maintains, Mr. Boyd drove his ATV on the side of the road opposite from Deputy Beadles. Mr. Boyd was driving in Deputy Beadles' general direction, Mr. Boyd had already used his vehicle as a weapon to assault Deputy Beadles just minutes before, and Mr. Boyd could have easily turned and reached Deputy Beadles very quickly on what appears to be a relatively narrow road. Furthermore, the ATV "was not the only deadly weapon at" Mr. Boyd's disposal. *Thompson*, 762 F.3d at 439. It is undisputed that Mr. Boyd possessed a

machete and that Deputy Beadles was aware of that fact. Deputy Beadles had no way of ascertaining whether Mr. Boyd intended to use that machete if he was forced to stop, and Mr. Boyd had to that point exhibited no visible sign of surrender, even after Deputy Beadles' multiple attempts to stop him. While Mr. Travis did testify that in his view the officer never appeared to be in any danger, courts have found such opinions to be irrelevant under circumstances similar to those presented here. *See Waterman*, 393 F.3d at 479 n.8; *Pace*, 283 F.3d at 1280 & n.11. There is no evidence that Mr. Travis was aware that Mr. Boyd had a machete on his ATV or that he had used his ATV as a weapon against Deputy Beadles just minutes prior to the shooting. Thus, the Court cannot say that it was clearly established at that time that Deputy Beadles was unjustified in assuming Mr. Boyd presented an ongoing threat of serious harm to Deputy Beadles or others, even if Mr. Boyd was on the other side of the road.

Lastly, cases have not clearly established that deadly force is unreasonable when a fleeing suspect headed in an officer's general direction is "right before up even" with an officer. In *Waterman*, the officers were entitled to qualified immunity when they stood anywhere from sixteen to seventy-two feet ahead of Waterman's accelerating vehicle when they began shooting. 393 F.3d at 474. The officers were denied immunity only for the shots fired after the vehicle had passed. *Id.* at 482. This set of shots was fired as the officers "scrambled toward Waterman" after Waterman's vehicle had passed all of them. *Id.* at 475. The officers fired all of their shots within an "approximately-six-second period after Waterman's vehicle lurched

forward." *Id.* The Fourth Circuit found that it was not justified to fire after the car had passed because "after the vehicle had passed the officers, the officers had access to new information regarding the perceived threat and should therefore have changed their response accordingly." *Hathaway*, 507 F.3d at 321 (discussing *Waterman*, 393 F.3d at 481). Similarly, in *Lytle*, the court denied summary judgment because the officer fired shots at the car "three or four houses away" as it was headed in the opposite direction. 560 F.3d at 413.

Here, Mr. Travis testified that Deputy Beadles began to fire right before Mr. Boyd was "up even" with the officer. With respect to this first shot fired, not only is there not a case directly on point for this factual circumstance, existing precedent has not removed this particular question beyond debate. Though Deputy Beadles did not violate clearly established law with the initial shot, this is not necessarily dispositive of whether he is entitled to qualified immunity on all of the shots fired. It is true that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle*, 560 F.3d at 413 (citing *Waterman*, 393 F.3d at 481). Deputy Beadles fired a total of six shots, and the autopsy report indicates that Mr. Boyd sustained bullet wounds to the right side of the back and left lower leg. However, Plaintiffs have not demonstrated that at the moment when Deputy Beadles fired this last shot, he had sufficient access to new information, and time to react, regarding the perceived threat such that he should have altered his response accordingly.

Rather, there is no factual dispute in the evidence that, as Deputy Beadles testified, all six shots were fired within a second and a half. This is materially different from *Waterman*, where the officers fired a combined eight shots within a six-second period, and continued to fire multiple shots after Waterman passed as the officers "scrambled toward Waterman." 393 F.3d at 475. In *Lytle*, the driver was twelve-to-fifteen feet in front of O'Donnell and began backing up towards the deputy. The driver then began to drive away and made it three or four houses down the block before the deputy fired at the rear of the Taurus. Here, the "extremely brief period of time" Deputy Beadles had to react was insufficient for him to perceive "new information indicating the threat was past." *Hathaway*, 507 F.3d at 322. "Instead, the entirety of the officer's actions were predicated on responding to a serious threat quickly and decisively. That his decision is now subject to second-guessing – even legitimate second-guessing – does not make his actions objectively unreasonable given the particular circumstances of the shooting." *Id.* There are no facts from which to infer that sufficient time passed for Deputy Beadles to perceive that the threat to him had ceased.

Plaintiffs have not argued that Mr. Boyd driving his ATV could not pose the same "threat of serious physical harm" as a driver in a car, *Garner*, 471 U.S. at 11, nor have they cited any cases that require this Court to analyze the threat posed by Mr. Boyd in this case differently merely because he drove an ATV rather than a car. Taken together, the legal authority does not "clearly establish" that Deputy Beadles violated the Fourth Amendment under the facts presented here. Rather, the cases

suggest that Deputy Beadles' actions fell in the "hazy border between excessive force and acceptable force." *Brosseau*, 543 U.S. at 600. Deputy Beadles is therefore entitled to qualified immunity on Plaintiffs' excessive force claim.

III. <u>CONCLUSION</u>

To the extent the Court has not addressed any of the parties' arguments, it has nevertheless considered them and determined that they would not alter the result. The Court concludes that Defendant Terry Beadles is entitled to qualified immunity because Plaintiffs have not shown that Deputy Beadles' conduct violated clearly established law or was objectively unreasonable.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Defendant Terry Beadles' Motion [42] for Summary Judgment Premised on Qualified Immunity is **GRANTED**, and Plaintiffs' claims against Defendant Terry Beadles are **DISMISSED WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED** that the stay of proceedings is lifted. The parties are directed to contact the Magistrate Judge within ten (10) calendar days to schedule a Case Management Conference as it relates to Plaintiffs' claims against Defendant Pike County.

**SO ORDERED** this the 15th day of March, 2018.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE